# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STEPHEN WHITAKER,

      Plaintiff,

    v.

CENTRAL INTELLIGENCE AGENCY,
*et al.,*

      Defendant.

Civil Action No. 12-316 (CKK)

## MEMORANDUM OPINION
(March 10, 2014)

Plaintiff Stephen Whitaker has filed suit against Defendants the Central Intelligence Agency, the United States Department of Defense, and the United States Department of State challenging Defendants' processing of his requests pursuant to the Freedom of Information Act and the Privacy Act. Presently before the Court is Defendants' [5] Motion for Summary Judgment. Upon consideration of the pleadings[1], the relevant legal authorities, and the record as a whole, the Court GRANTS IN PART and DENIES IN PART Defendants' [5] Motion for Summary Judgment. Specifically, the Court GRANTS Defendants' motion with respect to (1) Plaintiff's claims against Defendant Department of Defense, (2) Defendant CIA's invocation of FOIA Exemption (b)(5), (3) the adequacy of Defendant State Department's search with respect to its failure to locate records in the Office of Passport Services, (4) Defendant State Department's failure to process Plaintiff's requests for his father's records under the Privacy Act,

---

[1] Complaint, ECF No. [1] ("Compl."); Defs.' Mot. for Summ. J., ECF No. [5] ("Defs.' MSJ"); Errata, ECF No. [11]; Pl.'s Opp'n to Defs.' Mot. for Summ. J., ECF No. [14-1] ("Pl.'s Opp'n"); Defs.' Reply Mem. in Supp. of Defs.' Mot. for Summ. J., ECF No. [20] ("Defs.' Reply"); Notice of Supplemental Authority, ECF No. [21]; Notice of Filing Document for *In Camera* Review, ECF No. [23].

(5) Defendant State Department's invocation of Exemption (b)(5), and (6) Defendant State Department's invocation of Exemption (b)(6).  The Court DENIES WITHOUT PREJUDICE Defendants' motion with respect to (1) Defendant CIA's invocation of FOIA Exemption (b)(3) pursuant to the CIA Act of 1949 and the National Security Act of 1947, and (2) the adequacy of Defendant State Department's search with respect to its failure to search for records regarding Major Lawrence Eckmann.

## I. BACKGROUND

### A.  Factual Background

Between January 2008 and January 2012, Plaintiff filed a series of requests with Defendants pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a.  These requests sought records pertaining to the disappearance of a DC-3 airplane, three other planes, Harold Whitaker (Plaintiff's father) and four other individuals, the United States Army's investigation into the disappearance of the plane, the Plaintiff himself, and the Plaintiff's previous FOIA requests.  The details of these requests are set out below.

### 1.  CIA

On February 15, 2010, Plaintiff sent a FOIA request to the CIA requesting information "relat[ing] in any way to five individuals," including Plaintiff's father, Harold W. Whitaker, and "four DC-3 aircraft."  *See* Defs.' MSJ, Ex. A (Declaration of Martha M. Lutz, Information Review Officer, Director's Area, Central Intelligence Agency) ("Lutz Decl.") ¶ 9; Compl. at 5. Plaintiff defined the scope of his request to include any information that would reveal whether "any of these persons or aircraft were later found to be employed or contracted by the CIA for service in Central America or elsewhere."  Lutz Decl. ¶ 9.  The CIA acknowledged and responded to this request by letter on February 24, 2010, assigning to the request Reference

Number F-2010-00611.  *Id.* ¶ 10.  In this letter, Defendant CIA issued a *Glomar* response, refusing to confirm or deny the existence or non-existence of records responsive to Plaintiff's request.  *Id.*; *see also Phillippi v. CIA*, 546 F.2d 1009, 1013 (D.C. Cir. 1976) (affirming CIA's use of the "neither confirm nor deny" response to a FOIA request for records concerning CIA's reported contacts with the media regarding Howard Hughes' ship, the "Hughes Glomar Explorer").  Plaintiff appealed the CIA's *Glomar* response in a letter dated April 8, 2010, and the CIA's Agency Release Panel denied the appeal on June 27, 2011.  Lutz Decl. ¶¶ 11, 13.

On March 24, 2011, Plaintiff sent a second request to the CIA under the FOIA and the Privacy Act, requesting "all records about [Plaintiff] and [Plaintiff's] father indexed to [Plaintiff's] or [Plaintiff's] deceased father's name."  *Id.* ¶ 14. Defendant CIA separated the requests pertaining to each individual and assigned the request for information pertaining to the Plaintiff as Request No. P-2011-00460.  *Id.* ¶ 15.  The CIA's search for records that might reflect an open Agency affiliation or otherwise acknowledge Agency affiliation existing through March 30, 2011 yielded no responsive records.  *Id.*  The CIA also asserted a *Glomar* response regarding any records that might "reveal a classified connection to the CIA."  *Id.*  Defendant appealed the adequacy of Defendant CIA's search and its *Glomar* response on May 12, 2011, and the CIA accepted this appeal on August 19, 2010.  *Id.* ¶¶ 16, 20.  In response to Plaintiff's appeal, the CIA searched its repository of records containing information about FOIA requests (CIA-14) and searched for any responsive records relating to the Plaintiff's FOIA requests predating March 30, 2011 – the date the CIA received and accepted Plaintiff's appeal.  *Id.* ¶¶ 81-85.

Because the part of Plaintiff's second FOIA request to Defendant CIA requesting information pertaining to Harold W. Whitaker was duplicative of the request in No. F-2010-

00611, it was incorporated into the processing of that earlier request, which was on appeal at the time. *Id.* ¶ 16.

### 2. Department of Defense

On November 19, 2009, Plaintiff submitted a FOIA request to the United States Air Force ("USAF") for records "relating to the Ramstein US Air Force search for missing aircraft, beginning 3 October 1980 for a DC-3 departed [sic] Cuatro Vientos Airport in Madrid Spain for destination Frankfurt, waypoint Perpignon France."  The scope of the request included any referrals to or inquiry of the Federal Bureau of Investigation ("FBI"), the International Criminal Police Organization ("INTERPOL"), or other agencies, as well as any subsequent search efforts or investigations.  *See* Defs.' MSJ, Ex. B (Declaration of Valerie Bufano, FOIA Manager, Ramstein Air Force Base, United States Air Force) ("Bufano Decl.") ¶¶ 4, 6; Comp, at 9.

The request was assigned Request No. 2010-01041-F.  Bufano Decl. ¶ 4.  The Ramstein FOIA Office forwarded the request to the Ramstein Safety office ("86 AW/SEG"), the HQ Safety Center FOIA Office ("HQ AFSC/JAR") at Kirkland Air Force Base, the 435 Air Ground Operations Wing Office ("435 AGOW/HO"), the Air Force Office of Special Investigations Headquarters ("HQ AFOSI"), the USAF Europe Safety Office ("USAFE/SEF"), the USAF Europe History Office ("USAFE/HO"), and the USAF Europe Legal Office, Administrative Law Branch.  Each of these offices searched their files and discovered no records responsive to Plaintiff's request.  *Id.* ¶¶ 6-13.  On September 17, 2010, the Ramstein USAF Base closed the request and informed Plaintiff that no responsive records were located.  Plaintiff did not appeal the adequacy of Defendant's search.  Bufano Decl. ¶ 4; Compl. at 9.

On August 15, 2011, Plaintiff resubmitted Request No. 2010-01041-F to the USAF; the new request was designated Request No. 2011-06326-F.  Compl. at 9; Bufano Decl. ¶ 4.  The

USAF denied the second request on August 16, 2011 as duplicative of the earlier request.  *Id.*

Plaintiff appealed the denial on August 19, 2011 and the appeal was denied on the same

"duplicate" basis.

On May 23, 2011, the U.S. Army Human Resources Command ("HRC") received

Plaintiff's FOIA/PA request, which was forwarded to it from the Army's FOIA Office.  *See*

Defs.' MSJ, Ex. C (Declaration of Michael Coen, Information Release Specialist, HRC, United

States Army) ("Coen Decl.") at ¶ 5.  The request on behalf of Plaintiff sought "[c]opies of all

U.S. Army records about his father, Harold Whitaker . . . and the investigation into his

disappearance in the DC-3 aircraft over Spain on 3 October 1980, along with Lawrence J.

Eckmann, a Major in the U.S. Army."  *Id.*  HRC records were searched in the Total Army

Personnel Database/Soldier Management System, which "maintains the Official Military

Personnel Files for all Active Duty members of the United States Army and those individuals

who have recently been separated."  *Id. ¶* 6.  HRC used the names Harold William Whitaker and

Lawrence J. Eckmann as well as the social security number provided for Harold Whitaker, but

no responsive records were located.  *Id.*  Plaintiff was notified of the search results in writing on

May 24, 2011.  *Id.*

On June 8, 2011, the U.S. Army Criminal Investigation Command ("USACIDC") Crime

Record Center ("CRC") received Plaintiff's FOIA request, which was forwarded to it from the

Army's FOIA office.  *See* Defs.' MSJ, Ex. D (Declaration of Michelle Kardelis, Chief of the

Freedom Information Act and Privacy Act Division, USACIDC CRC, United States Army)

("Kardelis Decl.") at ¶ 5.  The USACIDC searched its files for records relating to Harold W.

Whitaker and Lawrence J. Eckmann (Whitaker's co-pilot) as provided in the request.  No records

responsive to the request were located.  *Id. ¶¶* 6-8.  Plaintiff requested confirmation of the

USACIDC's search parameters on June 25, 2011.  The USACIDC responded on June 12, 2011,

confirming the search parameters it used and explaining the USACIDC's file management

system, as well as Plaintiff's right to appeal the search.  Compl. at 8; Kardelis Decl. ¶ 8.

### 3.  Department of State

On January 3, 2008, Plaintiff submitted a FOIA and Privacy Act request to the

Department of State, seeking "any and all investigative/travel records on file" relating to a

"[m]issing airplane investigation report resulting from 10.03.80 flight gone missing over Spain

with US citizen/pilot Harold William Whitaker and one other co-pilot."  *See* Compl. ¶10; Defs.'

MSJ, Ex. E (Declaration of Sheryl L. Winter, Director of the Office of Information Programs and

Services of the United States Department of State) ("Walter Decl.") ¶ 4.   The request was

assigned Case Control Number 200800250.  *Id.* ¶ 5.   The Office of Information Programs and

Services ("IPS") conducted a two-part search of its Central Foreign Policy records, resulting in

the retrieval of 19 responsive documents for the first part, and two responsive documents for the

second part.  *Id.* ¶¶ 8-9.  The first group of documents was released in full on June 22, 2009, and

the second group was released in full on August 5, 2009.  *Id.*

On July 31, 2008, Plaintiff submitted another FOIA and Privacy Act request to the

Department of State seeking records related to:

> Harold William Whitaker . . . Including travel, visa, special requests, federal
> benefits, piloting or travel in aircraft, DISAPPEARANCE [sic] in DC-3 Aricraft [sic]
> over Spain on 3 October 1980, search, coordination with European governments
> in search, correspondence with Adelynn Hiller Whitaker (wife who is since
> deceased) issuance of a Certificate of Death, Insurance, enduring notification of
> aircraft wreckage requests, etc.

Compl. ¶ 11; Walter Decl. ¶ 10.  This request was assigned Case Control Number 200904782.

Walter Decl. ¶ 11.  The IPS searched the Central Foreign Policy Records and Office of Passport

Services for records responsive to this request.   The Central Foreign Policy Records search

yielded the 19 documents already disclosed in the first part of the search from Case Number 200800250, while the Office of Passport Services search yielded no responsive documents.  *Id.* ¶¶ 13, 16.

On April 29, 2011, Plaintiff submitted a third FOIA and Privacy Act request to the Department of State, seeking records related to the Department's administrative processing of all his previous FOIA requests.  Compl. ¶ 18; Walter Decl. ¶ 17.  This request was assigned Case Control Number 201103392.  Walter Decl. ¶ 18.

On January 20, 2012, Plaintiff submitted another FOIA and Privacy Act request to the Department of State, seeking "all records which were classified as 'non-responsive' or 'irrelevant'" in processing Request No. 200904872.  Compl. ¶ 25; Walter Decl. ¶ 20.  This request was assigned FOIA Case Control Number F-2012-21285.  Walter Decl. ¶ 21.  The IPS reviewed 10 documents responsive to this request, withholding two, releasing seven, and referring the remaining documents to another agency, from which it originated.  *Id.* ¶ 22.  Additionally, IPS conducted supplemental searches for responsive documents, which uncovered three documents that were released in part to Plaintiff.  *Id.; see also* Defs.' MSJ, Ex. F (Declaration of Naomi J. Ludan, FOIA and Privacy Act Disclosure Specialist for the U.S. European Command) ("Ludan Decl.") ¶ 4.

### B.  Procedural History

On February 27, 2012, Plaintiff filed suit in this Court raising a variety of objections to the processing of his FOIA and Privacy Act requests by the Defendants.  *See generally* Compl. Defendants subsequently filed their [5] Motion for Summary Judgment seeking to dismiss this case in its entirety.  In his Opposition, Plaintiff narrowed the issues in dispute, withdrawing (but not conceding) his challenges to the Department of Defense's processing of his requests and effectively dismissing the Department of Defense as a Defendant.  Pl.'s Opp'n at 2.  In his

Opposition, Plaintiff clarified that only the following issues were in dispute.  With respect to the CIA, Plaintiff challenged the adequacy of the CIA's search as well as the Agency's invocation of FOIA Exemptions (b)(3) and (b)(5) to withhold information.  *Id.* at 2-17.  With respect to the Department of State, Plaintiff challenged the adequacy of the State Department's search, the State Department's failure to process Plaintiff's requests for records about his father under the Privacy Act, and the Department's invocation of FOIA Exemptions (b)(5) and (b)(6) to withhold information.  *Id.* at 17-28.  Defendants subsequently filed a reply in which they indicated that Plaintiff's objections to the adequacy of the CIA's search had been resolved.  Defs.' Reply at 1 n.1.  Plaintiff has not objected to this representation by Defendants in any subsequent filing, and thus the Court understands it to be an accurate representation of the remaining issues in dispute.

## II. LEGAL STANDARD

Congress enacted FOIA to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted). Congress remained sensitive to the need to achieve balance between these objectives and the potential that "legitimate governmental and private interests could be harmed by release of certain types of information." *FBI v. Abramson*, 456 U.S. 615, 621 (1982). To that end, FOIA "requires federal agencies to make Government records available to the public, subject to nine exemptions for specific categories of material." *Milner v. Dep't of Navy*, ⸺ U.S. ⸺⸺, 131 S.Ct. 1259, 1261-62 (2011). Ultimately, "disclosure, not secrecy, is the dominant objective of the Act." *Rose*, 425 U.S. at 361. For this reason, the "exemptions are explicitly made exclusive, and must be narrowly construed." *Milner*, 131 S.Ct. at 1262 (citations omitted).

When presented with a motion for summary judgment in this context, the district court must conduct a "de novo" review of the record, which requires the court to "ascertain whether

the agency has sustained its burden of demonstrating that the documents requested . . . are exempt from disclosure under the FOIA." *Multi Ag. Media LLC v. Dep't of Agriculture*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (citation omitted). The burden is on the agency to justify its response to the plaintiff's request. 5 U.S.C. § 552(a)(4)(B). "An agency may sustain its burden by means of affidavits, but only if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Multi Ag. Media*, 515 F.3d at 1227 (citation omitted). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *Am. Civil Liberties Union v. U.S. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011) (citations omitted). "Uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011) (citation omitted).  Summary judgment is proper when the pleadings, the discovery materials on file, and any affidavits or declarations "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

An agency also has the burden of detailing what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document.  *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977). Any nonexempt information that is reasonably segregable from the requested records must be disclosed. *Oglesby v. U.S. Dep't of the Army*, 79 F.3d 1172, 1178 (D.C. Cir. 1996). In addition,

district courts are obligated to consider segregability issues *sua sponte* even when the parties have not specifically raised such claims. *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).

## III. DISCUSSION

### A. CIA

Plaintiff challenges the CIA's response to his FOIA and Privacy Act requests on two grounds. First, Plaintiff contends that the CIA improperly invoked FOIA Exemption (b)(3). Pl.'s Opp'n at 4-12. Second, Plaintiff argues that the CIA improperly invoked FOIA Exemption (b)(5). *Id.* at 13-17. Plaintiff also initially argued that the CIA's search for records about his father was inadequate. *Id.* at 3-4. However, in its Reply brief, Defendants indicated that Plaintiff had withdrawn this objection to the adequacy of the CIA's search. Defs.' Reply at 1 n. 1. Plaintiff has not indicated that the Defendants have misrepresented his position and accordingly the Court understands this objection as no longer at issue.

#### 1. Exemption (b)(3)

FOIA Exemption (b)(3) shields information "specifically exempted from disclosure by statute . . . if that statute" either (1) "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue," or (2) "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). Here, the CIA has invoked two statutes – the CIA Act of 1949 and the National Security Act of 1947 – in withholding documents pursuant to Exemption (b)(3). Lutz Decl. ¶¶ 40-42. Whitaker concedes that both of these statutes permit withholding generally under Exemption (b)(3), but argues that the CIA is applying neither statute correctly here. Pl.'s Opp'n at 4. The Court addresses these contentions with respect to each statute below.

##### a. The CIA Act

Section 6 of the CIA Act states that "the Agency shall be exempted from the provisions of . . . any other law which require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency."  50 U.S.C. § 3507.[2]  Invoking this provision as grounds for withholding pursuant to Exemption (b)(3) with respect to Plaintiff's request, the CIA asserts that disclosure of certain information would impermissibly reveal the "functions" of the CIA.  *See* Lutz Decl. ¶ 88 ("Section 6 of the CIA Act protects from disclosure information that would reveal the CIA's organization, functions, including the function of protection of intelligence sources and methods, names, official titles, salaries, or numbers of personnel employed by the CIA."); *id.* ¶ 92 ("the CIA Act's statutory protection of information revealing the organization, functions and other information about the CIA is absolute").  Plaintiff argues that in using the CIA Act to withhold information related to the "functions" of the Agency, the CIA has read the statute too broadly.

As Plaintiff correctly points out, the use of the word "functions" in the CIA Act is tied to the phrase "of personnel employed by the Agency" which it modifies.  50 U.S.C. § 3507.  Defendants read the CIA Act too broadly when they assert that it generally permits withholding of all information related to the "functions" of the CIA.  Rather, the use of the word "functions" is limited by the statutory phrase "of personnel employed by the Agency."

In past cases, the D.C. Circuit has cautioned against reading the CIA Act too broadly to permit withholding of any information related to the CIA.  In *Phillippi*, 546 F.2d at 1015 n. 14 (D.C. Cir. 1976), the CIA argued that this provision's "reference to withholding information about the 'functions . . . of personnel employed by the Agency' allows the Agency to refuse to provide any information at all about anything it does."  The court rejected this argument on the

---

[2] The Lutz Declaration and the parties briefs cite to the former version of this statute, 50 U.S.C. § 403g.  *See* Lutz Decl. ¶ 42.  Pl.'s Opp'n at 8.

basis that it would improperly "accord the Agency a complete exemption from the FOIA." *Id.* "[T]here is no indication that the section is to be read as a provision authorizing the Agency to withhold any information it may not, for some reason, desire to make public." *Id.*  In subsequent cases, the D.C. Circuit has further emphasized the limited scope of withholding pursuant to this provision of the CIA Act, stating that this section "creates a very narrow and explicit exception to the requirements of the FOIA.  Only the specific information on the CIA's personnel and internal structure that is listed in the statute will obtain protection from disclosure." *Baker v. CIA*, 580 F.2d 664, 670 (D.C. Cir. 1978).  *See also Larson v. Dep't of State*, 565 F.3d 857, 865 n.2 (D.C. Cir. 2009) (applying this provision of the CIA Act "to withhold internal CIA organizational data"); *Linder v. Dep't of Defense*, 133 F.3d 17, 25 (D.C. Cir. 1998) (permitting withholding pursuant to this provision for "information concerning the agency's personnel, including their functions, names, and official titles").

As further support for his argument that the CIA Act only authorizes the withholding of personnel information rather than broad withholding of information relating to the CIA's functions, Plaintiff points to the significantly different statutory language in the National Security Agency Act, Pub. L. No. 86-36, § 6(a), 73 Stat. 63, 64 (1959), 50 U.S.C. § 3605(a). Pl.'s Opp'n at 9-10.  That provision, in contrast to the CIA Act, broadly prohibits "disclosure of the organization *or any function of the National Security Agency*, or any information with respect to the activities thereof . . . ." 50 U.S.C. § 3605(a) (emphasis added).  In *Hayden v. NSA/CSS*, 608 F.2d 1381, 1390 (D.C. Cir. 1979), the D.C. Circuit made clear that this provision extends more broadly than the CIA Act, because in contrast to the CIA Act, it "protects not only organizational matters . . . but also 'any information with respect to the activities' of the NSA." Accordingly, the D.C. Circuit recognized that the statutory withholding authority afforded to the

NSA was "broader than the CIA's." *Id.* at 1390.  Acquiescing in the CIA's broad reading of the provision to allow for withholding of any information related to the CIA's "functions" would contravene this result, negating the distinction recognized by the D.C. Circuit between the CIA Act and the broader National Security Agency Act.

Reviewing this same precedent in *National Security Counselors v. CIA*, Nos. 11-cv-443, 11-cv-444, 11-cv-445, 2013 WL 4111616 (D.D.C. Aug. 15, 2013), a case decided after the parties submitted their briefing, the court similarly found that the CIA was applying the CIA Act too broadly.  In that case, Judge Beryl A. Howell concluded, as this Court does, that "the plain text of the statute limits protection from disclosure *only to the functions and organization pertaining to or about personnel*." *Id.* at *55 (emphasis added).  Accordingly, this Court agrees with Plaintiff that the CIA has applied the CIA Act too broadly.

Defendants cite two cases for the proposition that the CIA Act authorizes the broad withholding of documents relating to the CIA's functions asserted here.  Defs.' Reply at 5.  However, these cases are inapposite.  In *Schoenman v. FBI*, 841 F. Supp. 2d 69, 84 (D.D.C. 2012), "[p]ursuant to the Central Intelligence Agency Act, the CIA withheld information about its foreign intelligence collection activities, the names of its employees, personal identifiers, official titles, file numbers, and internal organizational data." *Id*.  As an initial matter, "the names of its employees, personal identifiers, official titles, file numbers, and internal organizational data" would all appear to be information relating to CIA personnel that could properly be withheld under the statute.  The only issue is whether the opinion's approval of the CIA's withholding "information about [the CIA's] foreign intelligence collection activities" suggests a broader understanding of the statute that permits withholding of the CIA's functions generally.  *Schoenman* is too brief in its analysis to answer this question.  The opinion does not

state what "information about [the CIA's] foreign intelligence collection activities" the Agency was permitted to withhold and whether this material was divorced from information related to Agency personnel.   The opinion's brief discussion of this subject, consisting of only a few sentences, is too thin a reed for Defendants to stand on, particularly in light of the D.C. Circuit precedent narrowly construing the CIA Act.   Defendants' citation to *McGehee v. Dep't of Justice*, 800 F. Supp. 2d 220, 232 (D.D.C. 2011), is similarly unavailing as the CIA in that case sought to withhold information relating to the CIA's functions both under the CIA Act and the National Security Act, as "intelligence sources and methods."   Again, the brief reasoning in this opinion is too ambiguous to contradict the text of the statute.[3]

Accordingly, in light of the fact that the CIA has too broadly applied the CIA Act to withhold information pursuant to Exemption (b)(3), the Court orders the CIA to either (a) disclose any otherwise non-exempt information to Plaintiff, or (b) along with any subsequent renewed motion for summary judgment, file a more sufficient declaration and *Vaughn* index which justifies the actual relationship between the withheld information and personnel functions of the CIA.

### b.  The National Security Act

The National Security Act of 1947 vests the Director of National Intelligence with the authority to protect "intelligence sources and methods."   50 U.S.C. § 3024.[4]  Plaintiff concedes that this provision authorizes withholding under Exemption (b)(3), but argues that the CIA has applied it improperly here, by arguing that its processing materials for Plaintiff's FOIA and

---

[3] To the extent *McGehee* did actually read the CIA Act to broadly permit withholding of the CIA's "functions" rather than the "functions . . . of personnel employed by the Agency", the Court respectfully disagrees with its conclusion and agrees with Judge Howell's opinion in *National Security Counselors*, 2013 WL 4111616.

[4] The Lutz Declaration cites to the former version of this statute, 50 U.S.C. § 403-1(i)(1). *See* Lutz Decl. ¶ 41.

Privacy Act requests constitute "intelligence sources and methods" covered by the statute.  Pl.'s Opp'n 4-7.

In the Lutz Declaration, the CIA states that it has withheld pursuant to Exemption (b)(3) and the National Security Act "information pertaining to intelligence sources and methods, such as internal document processing methods and internal taskings and tasking responses within CIA's decentralized information management systems."  Lutz Decl. ¶ 90.  Plaintiff argues that these materials are not themselves "intelligence sources and methods" within the meaning of the National Security Act.  Pl.'s Opp'n at 7.  While Plaintiff concedes that these materials may contain "intelligence sources and methods", he contends that FOIA processing materials and document processing methods do not themselves constitute "intelligence sources and methods" within the meaning of the National Security Act.  *Id.*

Although the case law on the meaning of "intelligence sources and methods" is sparse, the precedent that exists carries great weight.  In *CIA v. Sims*, 471 U.S. 159 (1985), the Supreme Court provided the most extensive discussion of meaning of this term.[5]  Noting the "broad sweep" of the statutory phrase "intelligence sources and methods" the Court stated that "Congress simply and pointedly protected all sources of intelligence that provide, or are engaged to provide, information the Agency *needs to perform its statutory duties with respect to foreign intelligence*." *Sims*, 471 U.S. at 169-70 (emphasis added).  Accordingly, the Court specified that "[t]he 'plain meaning' of [the provision] may not be squared with any limiting definition that goes beyond the requirement that the information fall within the Agency's mandate to conduct foreign intelligence." *Id*. at 169.

---

[5] *Sims* addressed a prior version of the statute that referred to the Director of Central Intelligence.  *See* 471 U.S. at 163.  However, the revision of the statute to refer to the "Director of National Intelligence" has no bearing on this case.  *See Wolf v. CIA*, 473 F.3d 370, 377 n. 6 (D.C. Cir. 2007).

Relying on *Sims*, Plaintiff argues that FOIA processing materials as well as the CIA's methods for processing FOIA requests fall outside the definition of "intelligence sources and methods" and thus may not be withheld under the National Security Act.  Pl.'s Opp'n at 7. Plaintiff contends that these materials have nothing to do with the CIA's mandate to conduct foreign intelligence, but rather concern the CIA's separate obligation to process and release records under FOIA and the Privacy Act.  *Id.*

In their Reply Brief, Defendants provide a supplemental declaration from Martha Lutz which provides additional detail regarding the withholding of the FOIA processing materials pursuant to Exemption (b)(3) and the National Security Act.  *See* Defs.' Reply, Ex. 1 (Supplemental Declaration of Martha M. Lutz, Chief of the Litigation Support Unit, Central Intelligence Agency) ("Suppl. Lutz Decl.") ¶ 8.  Responding to Plaintiff's objections, this declaration states that, "[a]s a point of clarification, the CIA invoked Exemption 3 in conjunction with the National Security Act to protect *portions* of the records which discuss issues related to responding to plaintiff's requests for classified information."  *Id.* (emphasis added).  This declaration notes that the National Security Act was asserted to protect "discussion regarding formulating responses to requests, such as Plaintiff's, which ask for information *that would reveal intelligence sources and methods*."  *Id.* (emphasis added).  "Moreover," the declaration states, "to the extent that the records at issue contain information as to the CIA's collection, search, and intelligence analysis activities and capabilities, they constitute 'intelligence source[s] and methods' covered by the Act."  *Id.*

This Reply Brief and the Supplemental Lutz Declaration address some, but not all, of Plaintiff's arguments.  To the extent that the CIA asserts that the FOIA processing materials themselves contain intelligence sources and methods, these materials may be withheld.

Similarly, to the extent these documents discuss whether to disclose information *that would reveal intelligence sources or methods*, these materials may be withheld pursuant to the National Security Act.  As the Supreme Court set out in *Sims*, the CIA has "very broad authority to protect all sources of intelligence information from disclosure."  471 U.S. at 168-69.  "Because of this 'sweeping power', courts are required to give 'great deference' to the CIA's assertion that a particular disclosure could reveal intelligence sources or methods."  *Berman v. CIA*, 501 F.3d 1136, 1140 (9th Cir. 2007) (citations omitted).  "[I]t is the responsibility of the Director . . ., not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process."  *Sims*, 471 U.S. at 180.  *See also Linder v. Dep't of Defense*, 133 F.3d 17, 25 (D.C. Cir. 1998). Here, with the Supplemental Lutz Declaration, the CIA has stated that the document processing materials either themselves contain intelligence sources and methods – as they discuss the CIA's collection, search, and intelligence analysis activities and capabilities – or contain information that would *reveal* these intelligence sources and methods.  Suppl. Lutz Decl. ¶ 8.  In light of the "great deference" afforded the CIA pursuant to this provision, the Court concludes that this material may be withheld pursuant to the National Security Act and Exemption (b)(3).

However, despite this substantial deference, the Court still has an independent role to play in the FOIA analysis.  To the extent the CIA asserts that the FOIA processing materials are themselves "intelligence sources and methods," the Agency goes too far.  To be sure, as discussed, the Court agrees that these documents may contain "intelligence and methods."  Yet although the FOIA processing materials "may contain information that reveals intelligence sources and methods, this does not mean that [they] *themselves* are intelligence methods."  In

*Berman*, 501 F.3d 1136, the Ninth Circuit considered an analogous situation, with the CIA asserting that Presidential Daily Briefings ("PDBs") themselves constituted "intelligence sources and methods."  While the court agreed that the PDBs could be withheld on the basis that they *contained* intelligence sources and methods, it also held that the CIA swept too broadly in arguing that the PDBs themselves constituted intelligence sources and methods.  "If we were to accept the CIA's logic," the Court concluded, "then every written CIA communication – regardless of content – would be a protected 'intelligence method' because it is a method that [the] CIA uses in doing its work." *Id.* at 1146.  As the Ninth Circuit observed in that case, "whether or not a particular document used by the CIA in its ordinary course of business is an intelligence method depends upon the content of the document." *Id.*  So too here, the FOIA processing materials may contain intelligence sources and methods and thus may be withheld on the basis that their disclosure would reveal these intelligence sources and methods.  However, they may not be withheld on the *ipse dixit* that they simply *are* intelligence sources and methods.

It may turn out that this final point is largely academic, as no portion of the FOIA processing materials may be disclosed to Plaintiff without disclosing intelligence sources or methods or information that could reveal intelligence sources or methods.  Accordingly, the Court orders the CIA to either (a) disclose any otherwise non-exempt information to Plaintiff, or (b) along with any subsequent renewed motion for summary judgment, file a more sufficient declaration and *Vaughn* index which explains in greater detail why all of the information withheld pertains to intelligence sources and methods.

### 2.  Exemption (b)(5)

Plaintiff next challenges the CIA's withholding of information pursuant to FOIA Exemption (b)(5).  Pl.'s Opp'n at 13-17.  Exemption (b)(5) permits the withholding of "inter-

agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."   5 U.S.C. § 552(b)(5).   In invoking exemption (b)(5), the CIA has withheld this information pursuant to the deliberative process privilege and the attorney-client privilege.

### a.   Deliberative Process Privilege

The deliberative process privilege protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (quotation marks and citations omitted).  It recognizes "that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them." *Id.* at 8-9 (quotation marks and citations omitted). The privilege is designed to "protect the executive's deliberative processes – not to protect specific materials." *Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987). To qualify for protection under the privilege, materials must be "both 'predecisional' and 'deliberative.'" *Pub. Citizen, Inc. v. Office of Mgmt. and Budget*, 598 F.3d 865, 874 (D.C. Cir. 2010) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).  A document is predecisional "if it was generated before the adoption of an agency policy and deliberative if it reflects the give-and-take of the consultative process." *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 151 (D.C. Cir. 2006) (quotation marks and citations omitted). To be deliberative, information must "reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States Gas*, 617 F.2d at 866.  "The

agency has the burden of establishing what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Id.* at 868.

Here, Plaintiff challenges the CIA's invocation of the deliberative process privilege with respect to the following documents: C05505667, C05506206, C05505440, C05506192, C05543099, C05653569, C05764944, C05873262, C05873264, C05873265, C05873267, and C05873268. Pl.'s Opp'n at 13 n. 8. The Lutz Declaration states that "the CIA determined that the information withheld under FOIA exemption (b)(5) pertains to predecisional deliberations by personnel regarding the nature of information retrieved, the scope of legal exemptions, the application of exemptions to particular material, or making recommendations related to final Agency determinations." Lutz Decl. ¶ 93. Further, the Supplemental Lutz Declaration states that "[t]he deliberative process privilege also applies to these e-mails because they discuss and contain recommendations for completing the processing of plaintiff's request in relation to this litigation." Suppl. Lutz Decl. ¶ 11. Reviewing these declarations, the Court is satisfied that the information withheld from these documents is both predecisional and deliberative and thus falls under the deliberative process privilege.

First, these documents are predecisional. "To ascertain whether the documents at issue are pre-decisional, the court must first be able to pinpoint an agency decision or policy to which these documents contributed." *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984). Here, the documents at issue relate to the CIA's formulation of responses to Plaintiff's FOIA requests. Plaintiff argues that these documents are not protected by the deliberative process privilege because the ultimate decision regarding these requests is evident from the response letters and court filings provided by the CIA. Pl.'s Opp'n at 14. However, these documents are not themselves the responses to

Plaintiff's FOIA requests, nor does the Lutz Declaration state that they were adopted or incorporated by reference in the CIA's responses to Plaintiff. Rather, the Lutz Declaration characterizes these documents as intermediate recommendations generated in reaching the ultimate decision as to which materials to disclose to Plaintiff.

For similar reasons, these documents are also deliberative, as they relate to the CIA's discussions about how to respond to Plaintiff's FOIA requests. Discussions regarding "the nature of information retrieved, the scope of legal exemptions, the application of exemptions to particular material, [and] recommendations related to final Agency determinations", Lutz Decl. ¶ 93, would appear to reflect the necessary "give-and-take of the consultative process." *Coastal States Gas*, 617 F.2d at 866. Plaintiff argues that disclosure of this material would not inaccurately reflect or prematurely disclose the views of the agency, because the ultimate decision of the CIA regarding his FOIA and Privacy Act requests is clear from publicly disclosed documents such as the Lutz Declarations. Pl.'s Opp'n at 14. Accordingly, he argues that it is unreasonable to think someone reading these notes would mistake which conclusions were adopted as the official agency position. *Id.* The Court rejects this argument. Premature or inaccurate disclosure of agency views is not the only rationale for the deliberative process privilege. The privilege also exists to ensure that free and frank discussion among officials can occur, as "officials will not communicate candidly among themselves if each remark is a potential item of discovery . . . ." *Klamath*, 532 U.S. at 8-9.

Relatedly, Plaintiff argues that public disclosure of agency deliberations is "unlikely" "to stifle honest and frank communications within the agency" "in cases where there is no identifying information that would link an individual to a document." *Wilderness Soc'y v. Dep't of Interior*, 344 F. Supp. 2d 1, 15 (D.D.C. 2004). On this basis, Plaintiff argues that since the

CIA may withhold its employees' identifying information pursuant to the CIA Act and Exemption (b)(3), as discussed *supra*, redactions of the remainder of these e-mails is inappropriate under the deliberative process privilege.  Pl.'s Opp'n at 15-16.  The Court disagrees.  Although *Wilderness Soc'y* recognized "identifying information" as an important factor in assessing whether "disclosure is likely in the future to stifle honest and frank communications within the agency", the case goes on to say that even where such personal identifying information is lacking, "such a document can only properly be withheld if the defendant can clearly demonstrate that the document is both predecisional and deliberative."  344 F. Supp. 2d at 15.  Here, as discussed, Defendants have satisfied this burden.  Accordingly, even if CIA employees' identifying information were withheld from these documents, assertion of the deliberative process privilege would still be proper here with respect to these documents.

In addition, pursuant to its independent obligation to consider the issue of segregability, the Court is satisfied from the CIA's description of its review process that all reasonably segregable portions of these records have been produced.  *See* Lutz Decl., Ex. L (CIA *Vaughn* Index) at 4, 6, 10, 14 ("The CIA conducted a line-by-line review of this document to determine whether meaningful reasonably segregable, non-exempt portions of the document could be released.  This document is released in part because there is some meaningful, non-exempt information that can reasonably be segregated from any exempt information."); Errata, ECF No. [11], Ex. 1 (Supplemental CIA *Vaughn* Index) at 2, 4, 10, 14, 16, 18, 20 ("The CIA conducted a line-by-line review of this document to determine whether meaningful reasonably segregable, non-exempt portions of the document could be released.  This document is denied in full because there is no meaningful, non-exempt information that can reasonably be segregated from any exempt information.").

### b. Attorney-Client Privilege

"The attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services," as well as "communications from attorneys to their clients if the communications rest on confidential information obtained from the client." *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 618 (D.C. Cir. 1997) (quotation marks and citations omitted). In order to demonstrate the applicability of the privilege, the proponent must establish each of the following essential elements: (1) the holder of the privilege is, or sought to be, a client; (2) the person to whom the communication is made is a member of the bar or his subordinate and, in connection with the communication at issue, is acting in his or her capacity as a lawyer; (3) the communication relates to a fact of which the attorney was informed by his client, outside the presence of strangers, for the purpose of securing legal advice; and (4) the privilege has been claimed by the client. *In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984). A "fundamental prerequisite to the assertion of the privilege" is "confidentiality both at the time of the communication and maintained since." *Coastal States*, 617 F.2d at 863; *accord Fed. Trade Comm'n v. GlaxoSmithKline*, 294 F.3d 141, 146 (D.C. Cir. 2002).

"In the governmental context, the 'client' may be the agency and the attorney may be an agency lawyer." *Tax Analysts*, 117 F.3d at 618; *accord Coastal States*, 617 F.2d at 863 (The attorney-client privilege, as incorporated by Exemption (b)(5), applies when "the Government is dealing with its attorneys as would any private party seeking advice to protect personal interests, and needs the same assurance of confidentiality so it will not be deterred from full and frank communications with its counselors."). It is well-established, however, that not every communication between an attorney and a client – government or otherwise – is made "for the

purpose of securing legal advice or services." As the D.C. Circuit has explained, "consultation with one admitted to the bar but not in that other person's role as a lawyer is not protected." *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998) (per curiam) (citations and quotation marks omitted). Hence, a government attorney's "advice on political, strategic, or policy issues, valuable as it may [be], would not be shielded from disclosure by the attorney-client privilege." *Id*.

Here, the CIA has asserted the attorney-client privilege with respect to two documents, C05873267 and C05873268. Pl.'s Opp'n at 16. The CIA's initial materials stated only that these documents consisted of "attorney client privileged communication between CIA personnel and in-house counsel." However, after Plaintiff challenged this description as conclusory and insufficient to support the CIA's invocation of the privilege pursuant to FOIA Exemption (b)(5), Pl.'s Opp'n at 16-17, the CIA included with its reply brief a supplemental declaration from Martha Lutz which offers additional detail regarding these documents. The Supplemental Lutz Declaration states that these documents consist of internal e-mail communications, and that "[t]he attorney-client privilege applies to the portions of the emails that contain legal advice provided by the CIA's Office of General Counsel to IMS in connection with the instant litigation. The confidentiality of these communications was maintained and the contents of these emails were not shared beyond the parties." Supp. Lutz Decl. ¶ 10. Accordingly, based on the additional information provided in the Supplemental Lutz Declaration, the Court concludes that the CIA properly invoked the attorney-client privilege here. The declaration specifies that the CIA's Information Management Services (IMS) consulted with CIA's Office of General Counsel regarding legal advice in connection with this litigation. In addition, the CIA has claimed privilege over these documents and the confidentiality of these communications has been

maintained since the discussion.   Accordingly, assertion of the attorney-client privilege is appropriate here to protect "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Mead Data*, 566 F.2d at 252.

In addition, pursuant to its independent obligation to consider the issue of segregability, the Court is satisfied from the CIA's description of its review process that all reasonably segregable portions of these documents have been produced.  *See* Errata, ECF No. [11], Ex. 1 at 18, 20 ("The CIA conducted a line-by-line review of this document to determine whether meaningful reasonably segregable, non-exempt portions of the document could be released.  This document is denied in full because there is no meaningful, non-exempt information that can reasonably be segregated from any exempt information.").

### B.  State Department

Whitaker challenges the State Department's response to his FOIA and Privacy Act request on four grounds.  First, he alleges that the State Department performed an inadequate search for responsive records.  Pl.'s Opp'n at 17-19.  Second, he claims that State wrongly determined that records about Plaintiff's father were not subject to the Privacy Act.  *Id.* at 19-26. Finally, Whitaker argues that State improperly invoked FOIA Exemptions (b)(5) and (b)(6) to withhold information.  *Id.* at 27-28.

#### 1.  Adequacy of Search

Plaintiff offers two arguments that the State Department's search for records in response to his request was inadequate.  First, according to Plaintiff, "[e]ven though a significant percentage of records about the disappearance discussed the co-pilot, U.S. Army Major Lawrence Jerome Eckmann, State failed to conduct a search for records about Maj. Eckmann, searching only for records about Whitaker's father." *Id.* at 18.  Plaintiff argues that there is

significant chance that responsive records exist for Plaintiff's request which mention only Eckmann, and not Plaintiff's father.  Second, Plaintiff argues that the State Department's failure to locate any records in the Office of Passport Services ("PPT") regarding his father conflicts "with the records disposition schedule for various types of passport records, many of which dictate that such records are to be maintained for fifty years or more.  *Id.* (citing *id.*, Exhibit E (State Records Schedule, Chapter 13: Passport Records)).  Plaintiff contends that since there is a presumption that agencies do not destroy records in violation of an approved records schedule, the only explanation for the State Department's failure to locate passport records must be an inadequate search.

An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'"  *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (citation omitted).  "At summary judgment, a court may rely on [a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched."  *Ancient Coin Collectors Guild*, 641 F.3d at 514 (quotations and citation omitted).  "The agency cannot limit its search to only one or more places if there are additional sources 'that are likely to turn up the information requested.'"  *Valencia-Lucena*, 180 F.3d at 326 (citation omitted).  Ultimately, the adequacy of a search is "determined not by the fruits of the search, but by the appropriateness of [its] methods."  *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) (citation omitted).  *See also Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) ("[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*.") (emphasis in the original).

### a.   Failure to Search for Records Relating to Eckmann

In arguing that the State Department's search in response to his requests was inadequate in failing to search for records about Maj. Eckmann, Whitaker relies chiefly on *Kowalczyk v. Department of Justice*, 73 F.3d 386 (D.C. Cir. 1996).  In that case, a federal prisoner sent a FOIA request to the Washington, D.C. headquarters of the Federal Bureau of Investigation seeking "all records in agency files, including but not limited to the Federal case number 88 CR 701 and counsel for the defense Louis E. Diamond and Louis Rosenthal Esq." *Id.* at 388.  After learning that the Bureau only searched for documents responsive to his FOIA request at its Washington, D.C. headquarters, Kowalczyk brought suit, arguing that the Bureau was obligated to also search for records at its New York field office, as his conviction occurred in the Eastern District of New York.  The Bureau responded that Kowalczyk's request "did not alert its FOIA compliance staff that Kowalczyk wanted records that might be in the agency's New York office.  Kowalczyk says the staff should have realized that." *Id.*

The D.C. Circuit unanimously affirmed the district court's grant of summary judgment to the Bureau.  "A request reasonably describes records if 'the agency is able to determine precisely what records are being requested.'" *Id.* (quoting *Yeager v. Drug Enforcement Administration*, 678 F.2d 315, 326 (D.C. Cir. 1982).  Because Kowalczyk's request "made no reference to the New York field office, or, indeed, to New York" his request "did not enable the FBI to determine that the New York field office had responsive records." *Id.* at 389.  To be sure, the responsive records located by the Bureau's Washington, D.C. headquarters did "indicate that Kowalczyk was indicted in the Eastern District of New York and that the Bureau's New York office had records of his activities involving vehicle identification numbers and stolen cars." *Id.*  Yet none of the documents located bore the case number in the request – "88 CR 701" – and the request

did not mention anything regarding the nature of charges in that case. *Id.* Although under a duty to "conduct a search reasonably calculated to uncover all relevant documents," the Bureau was nevertheless not required to "speculate about potential leads" including, "the connection between 'Federal case number 88 CR 701,' to which Kowalczyk referred, and Kowalczyk's indictment in the Eastern District of New York [which its searches uncovered]." *Id.* "The Bureau", the panel concluded, "is not obligated to look beyond the four corners of the request for leads to the location of responsive documents." *Id.* Moreover, leads the requester *himself* discovers in the documents received from the agency are properly the subject of a second FOIA request. *Id.*

Nevertheless, despite this holding, the *Kowalczyk* court closed with a caveat. "This is not to say that the agency may ignore what it cannot help but know, but we suspect that it will be the rare case indeed in which an agency record contains a lead so apparent that the Bureau cannot in good faith fail to pursue it." *Id.* Stressing the narrow scope of this exception, the panel emphasized that an "agency need pursue only a lead that it cannot in good faith ignore, i.e., a lead that is both clear and certain." *Id.* "Put differently, an agency need only pursue leads that raise red flags pointing to the probable existence of responsive agency records that arise during its efforts to respond to a FOIA request." *Wiesner v. FBI*, 668 F. Supp. 2d 164, 170 (D.D.C. 2009). The exception did not apply to Kowalczyk because "[h]is FOIA request contains so little information that, in order to incur any obligation to search the New York field office, the Bureau would have had to find a document at headquarters specifically indicating that documents related to a case bearing the number 88 CR 701 were located in its New York office." *Kowalczyk*, 73 F.3d at 389.

In subsequent cases, the D.C. Circuit has cited *Kowalczyk* for the proposition that "[w]hen a request seeks all agency records on a given subject, the agency is obliged to pursue

any 'clear and certain' lead it cannot in good faith ignore." *Cooper v. Dep't of Justice*, No. 03-5172, 2004 WL 895748 at *2 (D.C. Cir. Apr. 23, 2004) (per curiam).   The D.C. Circuit has emphasized that an agency "must revise its assessment of what is 'reasonable' in a particular case to account for leads that emerge during its inquiry. Consequently, the court evaluates the reasonableness of an agency's search based on what the agency knew at its conclusion rather than what the agency speculated at its inception." *Campbell v. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998).

Here, Plaintiff submitted four FOIA requests to the State Department, which the Court lists below, along with the respective request numbers assigned by the State Department:

> Case No. 200800250: Records relating to "Missing airplane investigation report resulting from 10.03.80 flight gone missing over Spain with US citizen/pilot Harold William Whitaker and one other co-pilot.  The pilot was my father.  No wreckage was found.  He was declared dead by the US government.  I am seeking any and all investigative/travel records on file with the Department of State or FAA.  My father was prior an FAA flight inspector for ILS."

> Case No. 200904872: Records relating to "Harold William Whitaker . . . Including travel, visa, special requests, federal benefits, piloting or travel in aircraft, DISAPPEARANCE in DC-3 Aricraft [sic] over Spain on 3 October 1980, search, coordination with European governments in search, correspondence with Adelynn Hiller Whitaker (wife, who is since deceased) issuance of Certificate of Death, Insurance, enduring notification of aircraft wreckage requests, etc."

> Case No. 201103392: "[A]ll records pertaining to your office's administrative processing of all FOIA or Privacy Act requests [Whitaker] submitted to you since January 2008.  Two are Request Nos. 200800250 and 200904872, but there are others.  He requests records about ANY FOIA requests he has submitted since January 2008."

> Case No. 201221285: "[A]ll records which were classified as 'non-responsive' or 'irrelevant' in your processing of [Whitaker's] previous FOIA/PA Request No. 200904872.  You may exclude records which were classified as such because they were released to him in response to Request No. 200800250."

Walter Decl. ¶¶ 4, 10, 17, 20.  As Plaintiff appears to have discovered through the results of his various FOIA requests to the agencies involved in this case, Lawrence J. Eckmann was the co-pilot on board the airplane with Plaintiff's father.  Although none of Plaintiff's requests to the Department of State mention Eckmann by name, Plaintiff argues that the possible existence of other records regarding the missing airplane which only mention Maj. Eckmann was a "lead so apparent that the [State Department] [could not] in good faith fail to pursue it."  *Kowalczyk*, 73 F.3d at 389.  In support of this argument, Plaintiff points the Court to a document which was deemed non-responsive to Case No. 200800250 because it discussed Eckmann and the missing DC-3 airplane, but only referred to Whitaker's father in passing.[6]  Pl.'s Opp'n at 18.  He also notes that "a significant percentage of records about the disappearance discussed the co-pilot, U.S. Army Major Lawrence Jerome Eckmann."  *Id.*  Based on these documents, Plaintiff argues there are likely records pertaining to the disappearance of his father's airplane which mention Eckmann (the co-pilot of the plane) but not his father.  The Court finds that Whitaker has provided more than "[m]ere speculation that as yet uncovered documents may exist."  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991).  "Where specific records . . . are referenced in [agency] documents, it is no longer 'mere speculation' that the files exist."  *Hall v. CIA*, 881 F. Supp. 2d 38, 61-62 (D.D.C. 2012).  Yet in processing Case No. 200800250, the State Department admits that it only searched for the name Harold Whitaker (as well as variations on

---

[6] Whitaker obtained this document through his subsequent FOIA requests to the State Department, although it is unclear whether these documents were released in response to Case No. 20090482 or Case No. 201221285.  *Compare* Pl.'s Opp'n at 18 n. 10 (describing these documents as "only processed when Whitaker explicitly requested 'all records which were classified as 'non-responsive' or 'irrelevant' in State's processing of his previous request") *with* Walter Decl. ¶ 22 ("Plaintiff was also informed that in an abundance of caution, searches of the retired records of the . . . U.S. Embassy Madrid, U.S. Embassy Bonn . . . had been conducted in response to FOIA request 200904872 and resulted in the retrieval of three responsive documents. Of these, one was released in full and two were released in part.")

this name).  *See* Walter Decl. ¶ 27.  State's decision to search only for records related to Whitaker's father, and its corresponding failure to search for records related to Eckmann, Plaintiff argues, renders the search inadequate.

The Court agrees with Plaintiff that the State Department's search was inadequate and should have been revised to include a search for documents related to the disappearance of the DC-3 airplane that mention Eckmann, but not Whitaker.  This would appear to be the rare case "in which an agency record contains a lead so apparent that the [agency] cannot in good faith fail to pursue it."  *Kowalczyk*, 73 F.3d at 389.  Plaintiff's first request, Case No. 200800250, broadly sought records relating to the "[m]issing airplane investigation report resulting from [the] 10.03.80 flight gone missing over Spain . . . ."  Walter Decl. ¶ 4.  Although Plaintiff's request referred to his father by name as one of the plane's pilots, the request *also* referred specifically to a co-pilot on board the plane.  The co-pilot was admittedly unnamed, but the request nevertheless identified a concrete second occupant of the plane, as opposed to merely a potential or hypothetical additional occupant.  In contrast to *Kowalczyk*, where the Plaintiff made no reference to the New York field office, here Plaintiff explicitly referenced the co-pilot of the plane about which he sought records in his request.  Accordingly, upon learning from its search for documents related to Harold Whitaker that the co-pilot referenced in the request was Lawrence Eckmann, the State Department was presented with a "lead that [was] both clear and certain."  At this point, the Department was not required to "speculate about potential leads" or the connection between the co-pilot to which Whitaker referred and Eckmann.  The connection was obvious.

In arguing that its search was adequate, the State Department leans heavily on the language from *Kowalczyk* that an agency "is not obliged to look beyond the four corners of the

request for leads to the location of responsive documents." *Kowalczyk*, 73 F.3d at 389. Yet, as other courts of this district have noted, "this principle does not grant an agency *carte blanche* to ignore additional leads that unmistakably come to light during its search efforts." *Neighborhood Assistance Corp. of America v. U.S. Dep't. of Housing & Urban Dev.*, 2013 WL 5314457, *6 n. 3 (D.D.C. Sept. 24, 2013). More importantly, given Plaintiff's reference to the co-pilot in his request, the State Department did not need "to look beyond the four corners of the request for leads to the location of responsive documents." When State's search revealed the identity of this co-pilot, it should have followed up on the lead presented in the text of the request. Accordingly, the State Department's search was inadequate for failure to search for records relating to Major Eckmann.

### b. Missing Passport Records

Plaintiff also raises a second challenge to the adequacy of the State Department's search. Whitaker argues that the State Department's failure to locate any records in the Office of Passport Services ("PPT") regarding his father conflicts "with the records disposition schedule for various types of passport records, many of which dictate that such records are to be maintained for fifty years or more. Pl.'s Opp'n. at 18-19 (citing *id.*, Exhibit E (State Records Schedule, Chapter 13: Passport Records)). Plaintiff contends that since there is a presumption that agencies do not destroy records in violation of an approved records schedule, the only explanation for the State Department's failure to locate passport records must be an inadequate search. The Court disagrees.

Courts of this district have rejected similar challenges to the adequacy of a search based on apparently missing documents. *See, e.g., Piper v. U.S. Dep't of Justice*, 294 F. Supp. 2d 16, 22-24 (D.D.C. 2003); *Roberts v. U.S. Dep't of Justice*, No. 92-1707, 1995 WL 356320 (D.D.C.

Jan. 29, 1993).   For example, in *Piper,* the plaintiff "challenge[d] the adequacy of the Government's search by alleging many documents [were] missing from the files, and that there [were] gaps in the serialization of the files." *Id.* at 21.   Relying on the affidavits provided by the Government, the court rejected this challenge, concluding that the Government had shown that its search was reasonable.   In that case, the affidavits "demonstrated the adequacy of the search because they identif[ied] the affiants, their respective positions within the FBI, the treatment of plaintiff's FOIA request, and explain[ed], in detail, the FBI's Freedom of Information-Privacy Acts (FOIPA) Section's procedure regarding requests and the mechanics and scope of a CRS search." *Id.* at 23.   So too here, the State Department's declaration identifies its author, her position within the State Department, the treatment of Plaintiff's FOIA requests, and explains in detail the search procedure regarding these requests.   This description of the search procedure further specifies that "in response to [Plaintiff's] FOIA request number 200904872, a paralegal within PPT searched PPT's paper records and the [Passport Information Electronic Records System] database using the subject's full name, date of birth, and place of birth.   Searches were structured to capture responsive records created between January 1973 and January 1985.   PPT did not locate any responsive documents in response to these searches." Walter Decl. ¶ 28. Because this declaration describes in detail the search of the PPT records in response to Plaintiff's request, and "the Government enjoys a good faith presumption in FOIA actions," *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981), the Court will not find the State Department's search inadequate simply because it failed to turn up the records sought by Plaintiff.   "An agency need not 'establish beyond doubt' that it does not possess a document, but instead need only show that its search was reasonably adequate." *Roberts*, 1995 WL 356320, at *1.

In addition, despite Plaintiff's implicit assertions, the failure to retain these documents does not create liability on the State Department under FOIA.  As the Supreme Court has made clear, "FOIA is only directed at requiring agencies to disclose those 'agency records' for which they have chosen to retain possession or control."  *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 151-52 (1980).  "The Act does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained."  *Id.* at 152.  Relatedly, "[e]ven where the Government was obligated to retain a document and failed to do so, that failure would create neither responsibility under FOIA to reconstruct those documents *nor liability for the lapse.*"  *Piper*, 294 F. Supp. 2d at 22 (internal quotation marks and citation omitted) (emphasis added).  "Nothing in the law requires the agency to document the fate of documents it cannot find.  If a reasonable search fails to unearth a document, then it makes no difference whether the document was lost, destroyed, stolen, or simply overlooked."  *Roberts*, 1995 WL 356320, at *2.  Rather, "[w]hen an agency cannot locate a document, FOIA only requires the agency to show that it has made a reasonable search."  *Id.* The State Department has met that burden here with respect to the PPT records.  Accordingly, the Court does not find the State Department's search inadequate because of the failure to uncover PPT records relating to Plaintiff's father.  Furthermore, the fact that these records could not be located in spite of an applicable document retention schedule does not create liability for this Defendant.

### 2.  Privacy Act Processing

Plaintiff next argues that the State Department improperly processed his requests for his father's records only under FOIA, *and not* under the Privacy Act as well.  Pl.'s Opp'n at 19-26. In response, the State Department explains that it only processed these requests for Plaintiff's

father's records under FOIA, and not under the Privacy Act, because the records concern another individual – Plaintiff's father – and do not themselves concern Plaintiff, the requestor of the records.  Defs.' Reply at 11.  Defendants contend that the Privacy Act does not give third party requestors access to the records of deceased individuals.  *Id.*  Challenging this position, Whitaker argues that as his father's next-of-kin, he should be permitted to exercise his father's access rights under the Privacy Act.  Pl.'s Opp'n at 19-20.

The State Department appears to draw its position from the Privacy Act guidelines promulgated by the Office of Management and Budget ("OMB Guidelines") which are included in the Department of Justice's Privacy Act Guide.  These OMB Guidelines state that "the [Privacy] Act did not contemplate permitting relatives and other interested parties to exercise rights granted by the Privacy Act to individuals after the demise of those individuals."  40 Fed. Reg. 28,948, 28,951 (July 9, 1975).  Plaintiff goes to great lengths to argue that these Guidelines are unsupported by the case law and incorrect.  However, despite Plaintiff's arguments that these Guidelines are wrong, the Court notes that the D.C. Circuit has previously accorded *Chevron* deference to the OMB Guidelines in interpreting the Privacy Act.  *See, e.g., Albright v. United States*, 631 F.2d 915, 919 n.5 (D.C. Cir. 1980) (stating that the OMB Guidelines "are owed the deference usually accorded interpretation of a statute by the agency charged with its administration"); *Henke v. U.S. Dep't of Commerce*, 83 F.3d 1453, 1461 n.12 (D.C. Cir. 1996) (same); *Sussman v. U.S. Marshals Service*, 494 F.3d 1106, 1120 (D.C. Cir. 2007) (same). Anticipating this argument, Plaintiff also argues that these Guidelines are *not* entitled to *Chevron* deference.  Pl.'s Opp'n at 22-26.  As support for this proposition, Plaintiff cites to a footnote in the Supreme Court's opinion in *Doe v. Chao*, 540 U.S. 614, 620, 627 n.11 (2004), in which the majority stated "[t]he dissent does not claim that any deference is due [to the OMB Guidelines],

however, and we do not find its unelaborated conclusion persuasive."  Looking beyond the text

of the opinion to the transcript of the oral argument and the briefing in *Doe*, Plaintiff asserts that

in this footnote, the Supreme Court concluded that the OMB Guidelines interpreting the Privacy

Act are not entitled to *Chevron* deference because the Privacy Act is a statute administered by

the courts, and not by a federal agency such as OMB.  Pl.'s Opp'n at 25-26.

However, although Plaintiff reads the footnote in *Doe* as rejecting *Chevron* deference for

the OMB Guidelines, even after *Doe*, the D.C. Circuit has apparently rejected this reading,

adhering to the position that the OMB Guidelines *are* entitled to *Chevron* deference.   In

*Sussman*, a case decided three years after *Doe*, a unanimous panel of the D.C. Circuit stated that

"Congress explicitly tasked the OMB with promulgating guidelines for implementing the

Privacy Act . . . and we therefore give the OMB Guidelines 'the deference usually accorded

interpretation of a statute by the agency charged with its administration.'"  494 F.3d 1106, 1120

(D.C. Cir. 2007) (citing *Albright*, 631 F.2d at 920 n.5).   There is no doubt that the panel in

*Sussman* was aware of the Supreme Court's opinion in *Doe* and the discussion of the OMB

Guidelines in that case.   Indeed, in its own discussion of the deference owed to the OMB

Guidelines, the *Sussman* opinion actually cites to Justice Ginsburg's dissent in *Doe*.  *Sussman*,

494 F.3d at 1120 n.8 (citing *Doe*, 540 U.S. at 633 (Ginsburg, J., dissenting)).   Faced with this

precedent, this Court can only conclude that that the D.C. Circuit viewed the footnote in *Doe* as

dicta¸ or at least saw this sentence as not overruling the line of precedent according *Chevron*

deference to the OMB Guidelines in interpreting the Privacy Act.  This Court is bound by the

opinions of *both* the Supreme Court and the D.C. Circuit and has an obligation to read this body

of case law consistently.   Accordingly, where the D.C. Circuit has apparently considered and

determined that a sentence in a Supreme Court footnote does not overrule a consistent line of its

own precedent, this Court will decline to revisit that determination. While Plaintiff may ultimately persuade the D.C. Circuit to reconsider this position, it would be improper for this Court to take such action in disregard of binding D.C. Circuit precedent. *Cf. Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decision, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

Accordingly, in light of the OMB Guidelines interpreting the Privacy Act to preclude the exercise of Privacy Act rights by relatives on behalf of deceased individuals, the Court rejects Plaintiff's argument that the State Department was required to process his requests for his father's records under the Privacy Act as well as FOIA. The Privacy Act does not speak to the access rights of relatives of deceased individuals. However, the statute does make explicit provision for the rights of legal guardians to exercise Privacy Act rights on behalf of children and the legally incompetent. *See* 5 U.S.C. § 552a(h) ("For the purposes of this section, the parent of any minor, or the legal guardian of any individual who has been declared to be incompetent due to physical or mental incapacity or age by a court of competent jurisdiction, may act on behalf of the individual."). Because of this provision as well as "the overall thrust of the Act – that individuals be given the opportunity to judge for themselves how, and the extent to which, certain information about them maintained by Federal agencies is used, and the implicit personal judgment involved in this thrust", the OMB Guidelines conclude that "the [Privacy Act] did not contemplate permitting relatives and other interested parties to exercise rights granted by the Privacy Act to individuals after the demise of those individuals." 40 Fed. Reg. at 28,951. The Court cannot conclude that this interpretation of the Privacy Act is "manifestly contrary to the

statute", *Chevron, U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 844 (1984), and accordingly the Court will defer to the agency's interpretation.

### 3.  Exemption (b)(5)

Plaintiff next challenges the State Department's withholding of information from Document PP8 pursuant to Exemption (b)(5) based on the attorney-client privilege.  Pl.'s Opp'n at 27.

The State Department's declaration states that this document is "an e-mail chain between Department officials, including attorneys within the Office of the Legal Adviser, dated between March 15 and March 26, 2012."  Walter Decl. ¶ 55.  The declaration further describes the substance of the e-mail as such: "This e-mail chain begins with a Department attorney advising his clients of the filing of two new FOIA suits that had recently been brought against the State Department.  Subsequent e-mails contain follow up information from officers located within the Department's FOIA program." *Id.* ¶ 56.  Portions of this document are withheld.  As the basis for withholding this information pursuant to the attorney-client privilege, the declaration states that "[t]he withheld material reflects a confidential exchange between a Department attorney and his clients, and is thus exempt from release under the attorney-client privilege portion of FOIA exemption (b)(5)." *Id.*

Because the Walter Declaration made no reference to whether this confidential exchange occurred for the purpose of securing legal advice, the Court requested that Defendants provide Document PP8 for *in camera* review.  *See* Minute Order (Mar. 4, 2014); Notice of Filing Document for *In Camera* Review, ECF No. [23].  Having reviewed the document *in camera*, the Court finds that the description of the document contained in the Walter Declaration is accurate.  Furthermore, the assertion of the attorney-client privilege is appropriate here to protect

"confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Mead Data*, 566 F.2d at 252.  In addition, upon review, the Court concludes there is no reasonably segregable non-exempt portion of the e-mail chain not already disclosed.

### 4.  Exemption (b)(6)

Finally, Plaintiff challenges the withholding of information pursuant to Exemption (b)(6) in Documents X1 and X3.  Pl.'s Opp'n at 27-28.  Plaintiff states, without specifying how and when he learned this information, that the State Department has admitted that the withheld information pertains to Major Eckmann's family.  *Id.* at 27.  However, despite this apparent admission, the State Department has refused to identify the specific individuals whose privacy interests are affected.  *Id.*  Whitaker challenges this failure to identify these individuals, which he says stymies his ability to obtain the necessary privacy waivers.  Whitaker thus requests that this Court order State to either release the withheld information or identify the family members to whom it pertains so that Plaintiff may provide State with the applicable privacy waivers.  *Id.* at 27-28.

Plaintiff cites no case law for the proposition that an agency is obligated to disclose the identities of those individuals whose privacy interests are implicated in withholding pursuant to Exemption (b)(6).  Rather, it would appear to the Court, as the State Department argues, that "to inform Plaintiff which individuals the records he seeks relate to would defeat the entire purpose of Exemption 6 by revealing the very information the exemption protects."  Defs.' Reply at 13.  FOIA Exemption (b)(6) allows an agency to withhold 'personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Based on its declaration, the State Department appears to argue

that the identifying information of the individuals implicated *constitutes* a portion of the information withheld pursuant to Exemption (b)(6).  *See* Walter Decl. ¶ 52 ("Release of [the withheld] information would cause a clearly unwarranted invasion of the personal privacy of the named individual.  Further, release would not serve the 'core purpose' of the FOIA, as it would not show 'what the government is up to.'  Accordingly, this information is properly withheld under FOIA exemption (b)(6)."); *id.* ¶ 54 ("The release of *personally identifying information* of individuals who are not the subject of Plaintiff's FOIA request would cause a clearly unwarranted invasion of the personal privacy of the individuals named.") (emphasis added).  Accordingly, disclosure of the identities of the individuals whose privacy interests are affected would undermine the privacy interests served by the exemption.  In addition, the Walter Declaration states that, with respect to these documents, there is "no non-exempt information that may be segregated and released."  *Id.* ¶¶ 52, 54.  In light of these considerations, which Plaintiff does not rebut, the Court will neither order Defendants to disclose the withheld information nor to identify the individuals to whom it pertains.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' [5] Motion for Summary Judgment.  Specifically, the Court GRANTS Defendants' motion with respect to (1) Plaintiff's claims against Defendant Department of Defense, (2) Defendant CIA's invocation of FOIA Exemption (b)(5), (3) the adequacy of Defendant State Department's search with respect to its failure to locate records in the Office of Passport Services, (4) Defendant State Department's failure to process Plaintiff's requests for his father's records under the Privacy Act, (5) Defendant State Department's invocation of Exemption (b)(5), and (6) Defendant State Department's invocation of Exemption (b)(6).  The Court DENIES WITHOUT PREJUDICE Defendants' motion with respect to (1) Defendant CIA's invocation of

FOIA Exemption (b)(3) pursuant to the CIA Act of 1949 and the National Security Act of 1947, and (2) the adequacy of Defendant State Department's search with respect to its failure to search for records regarding Major Lawrence Eckmann.   An appropriate Order accompanies this Memorandum Opinion.

Dated: March 10, 2014

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge